**U.S. Department of Justice**



*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

July 20, 2007

By Hand & Electronic Filing

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 920
New York, New York 10007

    **Re:  United States v. Angela Huang, et al.**
         **06 Cr. 1006 (KMK)**

Dear Judge Karas:

    The Government respectfully submits this letter in response to the defendants' March 2, 2007 motions to suppress evidence seized and statements made during the arrest of defendant Bouhari Adoyi ("Adoyi") and defendant Fuyin Huang ("Huang") on July 26, 2006, and the defendant's subsequent post-hearing submissions.  The defendants contend: (1) that Adoyi's statements to law enforcement on July 26, 2006 should be suppressed, (2) that items seized from the first floor pursuant to Adoyi's consent to search should be suppressed, and (3) the contents found in Huang's backpack should be suppressed.  For the reasons set forth below, the Court should deny the defendants' motions.

### THE EVIDENTIARY HEARING

    On March 16, 2007, the Government conceded that a suppression hearing was necessary to resolve several issues concerning material facts in dispute.  As a result, the Court held an evidentiary hearing that took place over three days.  Over those three days, the Government called three witnesses employed by the United States Secret Service (the "Secret Service"), Special Agent Sarah Cantwil ("SA Cantwil"), Special Agent Randall Flint ("SA Flint"), and Special Agent Todd Bratz ("SA Bratz").  In addition, the Government called Detective Dino Polichetti ("Detective Polichetti") of the New York City Police Department ("NYPD").  During this hearing, defendant Adoyi testified and called a witness, former co-worker Jose Meca.

**I.    The Government's Case**

    **A.    *Special Agent Sarah Cantwil***

SA Cantwil was one of the co-case agents responsible for the investigation of A&B Trading, located on West 29th Street in Manhattan, New York. (May 21, 2007 Tr. ("May 21st Tr.") 25-26). She was responsible for leading the investigation, which utilized a confidential informant and another special agent acting in an undercover capacity, among other things. (May 21st Tr. 26). On July 26, 2006, SA Cantwil also participated in the arrests of defendants Bouhari Adoyi and Fuyin Huang. (May 21st Tr. 27).

On July 26, 2006, an undercover agent with the Secret Service (the "undercover agent") had gone into A&B Trading to make a "buy" of counterfeit handbags. (May 21st Tr. 29). At that time, the undercover agent negotiated a purchase of counterfeit handbags, left a deposit, and returned to the store for the merchandise. (May 21st Tr. 29). After the undercover agent left A&B Trading, other law enforcement agents, including SA Cantwil, entered and arrested both Adoyi and Huang. (May 21st Tr. 27-29).

When SA Cantwil and other law enforcement officers initially entered A&B Trading, they detained individuals who were in the store and conducted a security sweep of the premises. (May 21st Tr. 30). During this time, SA Cantwil's firearm remained in its holster. (May 21st Tr. 30-31).

Adoyi was immediately arrested pursuant to an arrest warrant and was handcuffed. (May 21st Tr. 31). SA Cantwil read Adoyi his <u>Miranda</u> rights. (May 21st Tr. 31). SA Cantwil read <u>Miranda</u> rights from a printed form to Adoyi, who was seated in a chair. (May 21st Tr. 31). SA Cantwil read the <u>Miranda</u> rights and waiver sentence by sentence, pausing after each sentence to ask Adoyi if he understood what she read. (May 21st Tr. 32). Adoyi indicated that he understood the <u>Miranda</u> warnings and waiver. (May 21st Tr. 34). It also appeared to SA Cantwil that Adoyi understood what she was saying and at no time did Adoyi indicate that he did not understand what SA Cantwil was saying nor did he request an interpreter. (May 21st Tr. 34-35). At that time, Adoyi waived his <u>Miranda</u> rights, but refused to sign the waiver form. (May 21st Tr. 33).

After Adoyi waived his Miranda rights, SA Cantwil asked Adoyi for consent to search the storefront and the back room of A&B Trading. (May 21st Tr. 35-36). At the time SA Cantwil asked Adoyi for this consent, she believed that Adoyi was a "large

part" of the counterfeiting operation at A&B Trading and possibly one of the managers or supervisors there. (May 21st Tr. 36). SA Cantwil based this belief on her knowledge that Adoyi had been involved in prior transactions with the undercover agent and that he was the person who showed the undercover agent the different bags that the undercover agent could choose from. (May 21st Tr. 31). SA Cantwil asked Adoyi for consent to search to premises in a normal and calm tone of voice and Adoyi, sitting down on a chair, both consented to the search and did not put any limitations on where law enforcement agents could search. (May 21st Tr. 38).

After Adoyi consented to the search, SA Cantwil and other law enforcement agents began a search of the front and back rooms of A&B Trading. (May 21st Tr. 40-41). These law enforcement agents found counterfeit bags hidden in closets, counterfeit labels, stamps used to create counterfeit labels, and a backpack that contained a small pink handbag with defendant Fuyin Huang's wallet, identification, business cards, and address book inside it. (May 21st Tr. 40-41). Additionally, law enforcement agents found $1,000 in pre-recorded buy money that had been used by the undercover agent to purchase counterfeit bags earlier in the day. (May 21st Tr. 41).

Specifically, NYPD Detective Dino Polichetti found the backpack and recovered its contents. (May 21st Tr. 41). After he discovered what was inside, Detective Polichetti called SA Cantwil over and SA Cantwil inventoried the evidence and confirmed that the money found inside the backpack was the same money that had been used in that day's undercover buy. (May 21st Tr. 41, 44).

B.   *NYPD Detective Dino Polichetti*

NYPD Detective Dino Polichetti became involved in the investigation of A&B Trading on July 26, 2006, the day of the arrests of Adoyi and Huang. (May 21st Tr. 130). Detective Polichetti was part of the "backup team," responsible for helping to provide security for the location. (May 21st Tr. 130). When Detective Polichetti eventually entered A&B Trading on July 26, 2006, he learned that individuals had been arrested and that one of the individuals had provided consent to search the premises. (May 21st Tr. 131).

After learning that consent to search had been given, Detective Polichetti participated in a search of the back room of A&B Trading. (May 21st Tr. 131). In that back room, Detective Polichetti found a zipped black backpack. (May 21st Tr. 132-33).

After he found this backpack, Detective Polichetti held the backpack up in the air and asked Adoyi, Huang, and another individual if the backpack was theirs. (May 21st Tr. 133-34). Adoyi and Huang were to the right of Detective Polichetti and Huang looked at the backpack, but did not claim it. (May 21st Tr. 134-35).

Detective Polichetti then unzipped the backpack and found a smaller pink purse. (May 21st Tr. 135). He then unzipped this pink purse and found a driver's license and an amount of United States currency. (May 21st Tr. 135). Detective Polichetti then called over another agent to inventory the backpack. (May 21st Tr. 136).

### C. *Special Agent Todd Bratz*

SA Todd Bratz became involved with the investigation of A&B Trading on July 26, 2006, the day of the arrests of Adoyi and Huang. (June 5, 2007 Tr. ("June 5th Tr.") 4). SA Bratz's initial responsibilities that day included controlling access into and out of A&B Trading in order to ensure the safety of the agents and occupants inside. (June 5th Tr. 4).

Shortly after the arrest warrants were executed and the scene was secure, SA Bratz entered A&B Trading and was assigned to watch over Adoyi. (June 5th Tr. 5). SA Bratz had been instructed that SA Cantwil had read <u>Miranda</u> rights to Adoyi and that Adoyi had waived these rights. (June 5th Tr. 6). SA Bratz sat next to Adoyi, who was seated in a hallway in the back of the store, with one hand handcuffed to the chair he was sitting in. (June 5th Tr. 6). At this time, SA Bratz did not question Adoyi. (June 5th Tr. 6-7).

SA Bratz gave Adoyi bottled water, got yogurt for Adoyi out of the refrigerator, and took Adoyi to the restroom a number of times. (June 5th Tr. 7). Adoyi also asked Bratz questions about what was going to happen to him and what was going on. (June 5th Tr. 7). SA explained that Adoyi was charged with selling counterfeit handbags to an undercover agent. (June 5th Tr. 9). SA Bratz understood what Adoyi was saying to him and Adoyi at no time requested an interpreter nor did he indicate to SA Bratz that he didn't understand what SA Bratz was saying. (June 5th Tr. 7).

At one point, SA Bratz and Adoyi left A&B Trading and went to the building next door after Adoyi said that he knew

where counterfeit handbags were being stored.[1] (June 5th Tr. 9). Soon thereafter, SA Bratz and Adoyi returned to A&B Trading. (June 5th Tr. 10). SA Bratz and other law enforcement agents transported Adoyi to the New York field office of the United States Secret Service, located in Brooklyn, New York. (June 5th Tr. 11). SA Bratz testified that it took approximately 25 minutes to get there. (June 5th Tr. 11).

Upon arrival at the New York field office, SA Bratz and another agent escorted Adoyi to an interview room on the 30th floor of the building. (June 5th Tr. 12). Prior to the interview, SA Bratz and the other agent secured their weapons in a locked area pursuant to Secret Service policies. (June 5th Tr. 12). When inside the interview room, SA Bratz read Miranda warnings to Adoyi from a printed form. (June 5th Tr. 13-15, GX 14). SA Bratz read Adoyi the Miranda warnings and the waiver line by line and, at the end of each line, SA Bratz asked Adoyi if he understood. (June 5th Tr. 15). At each line, Adoyi indicated to SA Bratz that he understood. (June 5th Tr. 15). After SA Bratz read the Warning of Rights to him, Adoyi then read the Warning of Rights himself from the form. (June 5th Tr. 15). Again, SA Bratz asked Adoyi if he understood his rights and Adoyi stated that he did. (June 5th Tr. 15). At that point, Adoyi signed the Warning of Rights. (June 5th Tr. 16).

SA Bratz then proceeded to read the Waiver of Rights in the same way, sentence by sentence. (June 5th Tr. 16) At each line, Adoyi indicated that he understood each sentence. (June 5th Tr. 16). Adoyi also read that section of the form himself. (June 5th Tr. 16). SA Bratz asked Adoyi if he was willing to waive his rights and Adoyi said that he was. (June 5th Tr. 16). Adoyi then signed the waiver of rights section of the printed form. (June 5th Tr. 16).

Once the Miranda warnings and waiver form had been signed by Adoyi, SA Bratz and another agent also signed the form. (June 5th Tr. 17). Adoyi then gave a statement in response to questions posed by the agents. (June 5th Tr. 17). Adoyi described his work at A&B Trading, how he came to work there, who he worked with, his duties and responsibilities, and his

---

[1] Adoyi identified a room on the second floor at the India Building, located at 146 West 29th Street in Manhattan, which he indicated was the storage room. (June 5th Tr. 9-10). Agents obtained a search warrant and searched the location, recovering thousands of counterfeit handbag and large presses used to stamp counterfeit labels onto these handbags.

-5-

involvement in the sale of counterfeit handbags. (June 5th Tr. 18). SA Bratz asked if Adoyi would be willing to provide a written statement and Adoyi indicated that he was willing to do so. (June 5th Tr. 18).

SA Bratz then provided Adoyi with a form that is used by the Secret Service for written statements. (June 5th Tr. 18). SA Bratz filled out the top of the form and read to him a statement of Miranda warnings that was printed at the top of the form. (June 5th Tr. 18). Adoyi waived those warnings again. (June 5th Tr. 18). When asked to start writing his statement on this form, Adoyi told SA Bratz that he did not write in English well. (June 5th Tr. 18-19). SA Bratz then volunteered to write the statement for Adoyi and Adoyi agreed. (June 5th Tr. 19).

Once Adoyi agreed to this, Adoyi re-told the facts that he had just previously discussed and SA Bratz wrote down what Adoyi said. (June 5th Tr. 19). SA Bratz emphasized that the statement needed to be accurate because it represented Adoyi's words and facts. (June 5th Tr. 19). SA Bratz told Adoyi that if anything in the statement was not fully correct or incomplete, Adoyi should tell him so that the statement could be amended. (June 5th Tr. 20). SA Bratz and Adoyi then went through the written statement line by line, with SA Bratz reading each line and Adoyi indicating whether the information was correct. (June 5th Tr. 20). Throughout the course of this process, Adoyi made a few corrections to the written statement which he initialed at the request of SA Bratz. (June 5th Tr. 20, 24, GX 15). Adoyi then signed and dated the written statement. (June 5th Tr. 20-23). Adoyi did not tell SA Bratz that he did not understand anything that was being said and Adoyi did not ask for an interpreter. (June 5th Tr. 17). SA Bratz was able to understand what Adoyi said and believed that Adoyi understood him. (June 5th Tr. 25).

   D.   *Special Agent Randall Flint*

Special Agent Randall Flint was a co-case agent, with SA Sarah Cantwil, responsible for the investigation of A&B Trading. (June 5th Tr. 76). He was responsible for investigating leads, identifying suspects and collecting evidence in the case against the defendants. (June 5th Tr. 76).

On July 26, 2006, SA Flint assisted an undercover officer in executing a buy-through transaction. (June 5th Tr. 77). SA Flint equipped an undercover agent with a video and audio recording device and after an undercover purchase of counterfeit handbags, removed the device from the undercover agent. (June 5th Tr. 79-80).

On that same day, SA Flint also participated in the search of A&B Trading. (June 5th Tr. 77). During this search, SA Flint heard Detective Polichetti ask whether anyone owned the black backpack that was found during the search, which nobody claimed. (June 5th Tr. 78-79).

## II. Defendants' Case

### A. Defendants' Affidavits

Fuyin Huang and Bouhari Adoyi filed motions seeking the suppression of evidence in February 2007. Along with those motions, both of these defendants filed sworn affidavits.

In Fuyin Huang's affidavit, Huang made statements about his employment at A&B Trading, his ownership of the black backpack that was recovered on the day of his arrest, that no one had permission to access its contents, and that he did not consent to a search of his backpack. (Fuyin Huang's Motion to Suppress, Exhibit B).

In Bouhari Adoyi's sworn declaration, Adoyi addressed his lack of English proficiency, the circumstances of his arrest and statement, and that he did not recall being given certain Miranda warnings. (Bouhari Adoyi's Motion to Suppress, Exhibit A). Additionally, he stated that he did not give consent to search A&B Trading. (Bouhari Adoyi's Motion to Suppress, Exhibit A).

### B. Defendants' Witnesses - Joel Meca and Bouhari Adoyi

On June 20, 2007, Counsel for Adoyi called Joel Meca, a former co-worker of Adoyi's at A&B Trading, as a witness. Meca testified that an agent yelled at him, called him stupid because he didn't speak English, and slapped him in the face. (June 20, 2007 Hearing Tr. ("June 20th Tr.") 4-5). Meca also testified that an agent told him that if he didn't tell the truth, Meca would be sent back to Mexico. (June 20th Tr. 6).

One of the defendants, Bouhari Adoyi, also testified. Adoyi testified about his background and his limited knowledge of English. (June 20th Tr. 11-16). Adoyi provided testimony about his dealings with the police in Togo. (June 20th Tr. 22-23). Adoyi also testified about the events of July 26, 2006, from his arrest to his statement. (June 20th Tr. 23-40). On cross-examination, Adoyi testified, among other things, that he spoke English to his co-workers and to customers at A&B Trading. (June 20th Tr. 41-43).

**DISCUSSION**

**I.  Consent to Search Was Voluntary and the Black Backpack was Properly Seized and Should Not be Suppressed**

   **A.  Bouhari Adoyi Granted Valid Consent to Search the First Floor of A&B Trading**

It is well settled that a search based on the consent of an individual may be undertaken without a warrant or probable cause and any evidence discovered during the search may be seized and admitted at trial.  Schneckcloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When the Government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary. See United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004). To determine whether consent was voluntarily given, courts examine the totality of the circumstances surrounding the consent.  Id. at 227.  The factors include the individual's knowledge of his right to refuse consent, his age, intelligence, and education, length and nature of his questioning, or the presence of coercive police behavior.  Id. at 226-27.  While more than a "mere acquiescence in a show of authority" is necessary to establish the voluntariness of a consent, United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993), the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness.  See United States v. Ansaldi, 372 F.3d 118, 129 (2d Cir. 2004)(holding that use of guns to effectuate arrest and handcuffing of the defendant did not render his consent to search his home involuntary); see also United States v Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990)(the defendant being handcuffed does not, by itself, render the consent involuntary).

The totality of the circumstances surrounding Adoyi's consent to search indicate that consent was voluntarily given by Adoyi.  First, despite Adoyi's assertions to the contrary, Adoyi speaks and understands English.  Over several undercover purchases of handbags, Adoyi always spoke English to the undercover agent. (May 21st Tr. 31, June 20th Tr. 42-43, GX 11). Adoyi testified that he spoke English with his co-workers at A&B Trading.  The undercover video introduced into evidence and agent testimony indicates that Adoyi was the person who typically dealt with customers at A&B Trading. (May 21st Tr. 36, GX 11). Additionally, on the date of his arrest, Adoyi asked questions in English, never asked for an interpreter or indicated that he did not know English, and provided a detailed statement in English to SA Bratz. (June 5th Tr. 7, 17-18).

Next, Adoyi was carefully advised of his Miranda warnings by Special Agent Cantwil before being asked for consent to search A&B Trading. (May 21st Tr. 32-35). Adoyi chose not to sign the actual Miranda form and waiver, although he waived his rights orally, indicating that Adoyi felt free to refuse to sign the form the agents asked him to sign. (May 21st Tr. 35). After he refused, Adoyi was not pressured to sign the form. (May 21st Tr. 35). Adoyi also was seated when he was asked for consent to search by SA Cantwil, who spoke to Adoyi in a normal tone of voice and without her gun drawn. (May 21st Tr. 32).

Adoyi contends that his experiences with the law and police in Togo led to a belief that he could not refuse consent. (Adoyi Post-Hearing Brief at 3). Such an argument has been addressed and given short shrift in a number of cases, primarily in the context of Miranda rights and confessions. Former Chief Judge Mukasey rejected just such a claim in a case in which the defendant stated that "he believed a hypothesized obligation in his native Taiwan to respond to government inquiries applied to his INS interview in the United States." United States v. Su, 97 Cr. 319 (MBM), 1997 WL 695655, at *7 (S.D.N.Y. Nov. 6, 1997). Judge Mukasey rejected the defendant's argument that additional warnings beyond Miranda were required, holding that "[w]ere the rule otherwise, we would have different Miranda warnings for each defendant, depending on his cultural background and country of origin. That is unworkable, and it is not the law." Id.; accord United States v. Samuel, Cr. A. 98-180, 1998 WL 401705, at *3 (E.D. Pa. Jul. 1, 1998) ("The fact that [defendants] may have been influenced by their Gypsy culture to answer [the agent's] questions does not invalidate their Miranda waivers. Otherwise, a waiver of one's Miranda rights would depend upon one's upbringing. . . . We simply cannot base the validity of a waiver on whether or not a person was taught to answer questions of law enforcement officers."); United States v. Huynh, 60 F.3d 1386, 1388 (9th Cir. 1995) (rejecting defendant's claim that "her waiver was involuntary because her Southeast Asian background made her incapable of a free and voluntary choice"). In this case, Adoyi was given Miranda warnings prior to being asked for consent. Adoyi's argument that he believed that he could not refuse consent because he "believed he had a duty to comply with the wishes of the officer" is directly contradicted by his refusal to sign the Miranda form after he made the oral waiver.

Adoyi's consent to search the first floor of A&B Trading was valid and covered the entire first floor, since Adoyi did not limit his consent to search in any way. A third party may validly consent to the search of an area in which another has a reasonable expectation of privacy where the third party shares

common authority over the area.  <u>United States</u> v. <u>Matlock</u>, 415 U.S. 164, 171 (1974). The Second Circuit has held that a third party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and second, either (1) common authority over the area; (2) a substantial interest in the area, or (3) permission to gain access.  <u>United States</u> v. <u>Gradowski</u>, 502 F.2d 563, 564 (2d Cir. 1974); <u>see also</u> <u>United States</u> v. <u>Trzaska</u>, 859 F. 2d 1118, 1120 (2d Cir. 1988).

      Here, Adoyi undoubtedly had access to the backroom of A&B Trading.  In the video that was introduced into evidence, Adoyi can clearly be seen emerging from the backroom of A&B Trading. (GX 11).  During undercover buys, agents with the Secret Service learned that Adoyi was often getting counterfeit bags from the backroom of A&B Trading.  (May 21st Tr. 36-37).

      It is also clear for the same reasons that Adoyi had permission to gain access, a substantial interest in the area, and common authority over the area.  The backroom contained counterfeit bags and also was a common area for employees, containing a refrigerator, which Adoyi used and had yogurt in, and a microwave. (May 21st Tr. 133). Since both prongs have been met, Adoyi's third party consent to the search of A&B Trading is valid.

      Even if one assumes *arguendo* that Adoyi did not have actual authority to consent to a search of A&B Trading, the search of the first floor of A&B Trading would still be justified since Adoyi had apparent authority to consent to the search.  <u>See</u> <u>Illinois</u> v. <u>Rodriguez</u>, 497 U.S. 177 (1990).  The ultimate question is whether "the officer had a reasonable basis for believing that there had been consent to the search."  <u>United States</u> v. <u>Garcia</u>, 56 F.3d 418, 423 (2d Cir. 1995).  Here, SA Cantwil believed that Adoyi had authority to consent to a search since Adoyi was a "large part" of the counterfeit process and "one of the managers or supervisors" of the operation. (May 21st Tr. 36).  As can be seen from the video from the video of the undercover buy, the undercover agent dealt primarily with Adoyi during the purchase of counterfeit handbags. (GX 11).  Adoyi handled the money, handled the merchandise, showed different bags that the undercover could purchase, and essentially was "always involved" in the transactions. (May 21st Tr. 36).  SA Cantwil also had learned throughout the course of the investigation that Adoyi had brought out counterfeit handbags from the back room. (May 21st Tr. 36-37).  As a result, SA Cantwil's belief that Adoyi had authority to consent to a search of the first floor of A&B

Trading, including the backroom, was clearly reasonable, and for this reason alone, Adoyi's consent to search would be valid.

### B. Consent to Search Provided by Bouhari Adoyi Extended to Fuyin Huang's Black Backpack

The consent to search provided by Adoyi, by the terms of his consent, included consent to search Fuyin Huang's black backpack. "When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search is constrained by the bounds of reasonableness: what a [law enforcement agent] could reasonably interpret the consent to encompass." United States v. Zapata, 180 F.2d 1237, 1242 (11th Cir. 1999). "If the consent to search is open-ended, a reasonable person would have no cause to believe that the search will be limited in some way." United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995). In any event, "if the search exceeded the scope of the consent given, an officer's objectively reasonable belief that the search was within the scope of that consent is sufficient to validate the search." United States v. Elliott, 50 F.3d 180, 186 (2d Cir. 1995).

A broad consent carries with it permission to search closed containers found within the premises. Florida v. Jimeno, 500 U.S. 248, 252 (1991)(No need to separately request permission to search each container within a car). In Florida v. Jimeno, a police officer, who had been following a car driven by a suspected drug dealer, stopped the car for a traffic infraction. Id. at 249-50. In the course of the stop, the officer asked for permission to search the car. Id. The driver consented to a search and the officer found cocaine inside a folded paper bag on the floor of the car. Id. The Supreme Court found that it was reasonable for an officer to expect that a suspect's general consent to a search of his car included consent to examine a closed container inside that car. Id. at 251. In reaching this holding, the Supreme Court reasoned "[a] suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." Id. at 252.

The agents reasonably understood Adoyi's broad general consent to search A&B Trading as authorizing them to search Fuyin Huang's backpack. It is well established that a third party may give consent for the search of another's private belongings. In particular, a third party may validly consent to the search of an area in which another has a reasonable expectation of privacy

where the third party shares common authority over the area. <u>United States</u> v. <u>Davis</u>, 967 F.2d 84, 86 (2d Cir. 1992) (citing <u>United States</u> v. <u>Matlock</u>, 415 U.S. 164, 171 (1974)). As stated above, third-party consent will validate a search if (1) the third party had access to the area searched; and (2) either common authority over the area, a substantial interest in the area, or permission to gain access. See <u>Davis</u>, 967 F.2d at 87.

Adoyi plainly had access to Huang's unlocked and unsecured backpack which was in the backroom of A&B Trading. Adoyi also had common authority over items in the backroom of A&B Trading as well as a substantial interest in the area as an employee. Courts have upheld consent searches authorized by individuals with limited access to property owned by other individuals. For example, in <u>Davis</u>, the owner of a footlocker consented to its search, even though he had given the only key to the trunk to another person and permitted that individual to store items in the trunk. On the basis of that consent, this Court upheld not only the search of the locked footlocker, but also the search of closed containers within the trunk (which belonged solely to the defendant and not the individual providing the consent). <u>Id.</u> at 87-88. See also <u>United States</u> v. <u>Ramirez</u>, 115 F. Supp. 2d 401, 408-09 (S.D.N.Y. 2000) (finding defendant's girlfriend's consent valid to support search of defendant's personal possessions, including unlocked dressers and closets); <u>United States</u> v. <u>Perez</u>, 948 F. Supp. 1191, 1200-01 (S.D.N.Y. 1996) (defendant's father authorized to consent to search of defendant's bedroom, including closed containers in that room, even though father never used bedroom or examined son's items because they were personal and private).

Similarly, in <u>United States</u> v. <u>Snype</u>, 441 F.3d 119 (2d Cir. 2006), the Second Circuit held that an owner of an apartment could consent to a search of another person's belongings, specifically a knapsack and a plastic bag. The Court stated, "there is no question... [that] the lessor and resident of the apartment at issue, had the access and authority necessary to consent to a search of the entire premises. Thus, her open-ended consent would permit the search and seizure of any items found in the apartment with the exception of those 'obviously belonging to another person.'" <u>Id.</u> at 136 (quoting <u>United States</u> v. <u>Zapata-Tamallo</u>, 833 F.2d 25, 27 (2d Cir 1987)).

Here, there is no credible evidence that the backpack seized obviously and exclusively belonged to Fuyin Huang when it was seized and searched. The backpack is a nondescript, simple black backpack. (May 21st Tr. 132). It was out in the open, in the back storage room on a table. (May 21st Tr. 132-33). The

backpack did not have a name tag or anything on it that identified it as belonging to Fuyin Huang. (May 21st Tr. 132, GX 10). When Detective Polichetti lifted it up for Huang and others to see and asked whose bag it was, no one claimed the bag. (May 21st 134-35). As a result, Huang has failed to demonstrate that the backpack obviously belonged exclusively to him and that the agents could not reasonably rely on Adoyi's unrestricted consent to search all items found on the first floor of A&B Trading. See Snype, 441 F.3d at 136-37.

Additionally, Huang's privacy interest in the backroom of A&B Trading was extremely limited. It was a common space and even consisted of a microwave and refrigerator that were used by other employees at A&B Trading. Huang's backpack was not locked in any way and had no identification information. (May 21st Tr. 132). Huang's backpack was out in the open in an area used by other employees. As a result, Huang assumed the risk that the owner or an employee of A&B Trading would consent to a search of his possessions. See Davis, 967 F.2d at 88 (defendant assumed risk that homeowner would consent to search of defendant's closed containers).

In any event, even if Adoyi lacked the actual authority to consent to the search, the search was justified because he had the apparent authority to do so. See Illinois v. Rodriguez, 497 U.S. 177, 18 (1990). As previously stated, in light of Adoyi's status as an employee of A&B Trading, the primary contact person for the undercover buys of the counterfeit handbags, and Adoyi's obvious access to the backroom of A&B Trading and its contents, it was reasonable for agents to believe that he had the authority to consent to the search. United States v. Perez, 948 F. Supp. at 1201; see also Zapata-Tamallo, 833 F.2d at 27(homeowner's consent authorized search of guest's bag, where guest failed to prove bag was obviously his); United States v. Moran, 214 F.3d 950, 951-52 (8th Cir. 2000) ("It was also reasonable for the officers to think that [house trailer owner] had authority not only over the premises, as real estate, but also over all of their contents not obviously belonging to someone else."). Such reasonable belief by the agents, even if ultimately proven to be mistaken, validates the search. See Rodriguez, 497 U.S. at 188-89; United States v. Elliot, 50 F.3d at 186. Thus, even if the Court concludes that Adoyi lacked the actual authority to consent to the search of the backpack that ultimately turned out to belong to Huang, the motion to suppress should be denied.

**C. Alternatively, the Black Backpack Owned by Fuyin Huang Was Abandoned Property Because Huang Did Not Claim It.**

Mere ownership of property does not establish a legitimate expectation of privacy unless the owner vigilantly protects the right to exclude others. United States v. Torres, 949 F.2d 606, 608 (2d Cir. 1991). Therefore, even in the absence of a warrant and probable cause, a search of property that has been abandoned, for example, does not violate a privacy interest. See id. (No expectation of privacy in shoulder bag where defendant disclaimed ownership of bag and knowledge of its contents); see also United States v. Lee, 916 F.2d 814, 818 (2d Cir. 1990)(defendant's disavowal of ownership of suitcase constituted abandonment, thereby forfeiting any legitimate expectation of privacy).

Disclaiming ownership of property is a way that property can be abandoned. United States v. Welbeck, 145 F.3d 493, 498 (2d Cir. 1998)(holding that bag was abandoned when suspect denied ownership of it and that warrantless search and seizure of such abandoned property does not violate the Fourth Amendment). Fuyin Huang clearly disclaimed any ownership in the backpack when it was found. At the suppression hearing, Detective Polichetti testified that he found a black backpack and held it up in the air, asking if the backpack belonged to anyone. (May 21st Tr. 134). As Detective Polichetti was holding up the backpack and asking if anyone would claim it, Fuyin Huang (the "male asian") was "standing to the right of him" and looked at the backpack but said nothing. (May 21st Tr. 135). Despite the fact that Fuyin Huang could both hear Detective Polichetti and could see him hold up the backpack, Huang did not claim the backpack or acknowledge his ownership of it. (See May 21st Tr 134-135, June 5th Tr. 78).[2] Huang's silence spoke volumes he knew that the cash from an illegal transaction was in the backpack and wanted to distance himself from it.

Even if Huang argues that his knowledge of English is so limited that he could not understand the simple question about whose backpack it was, Huang would have understood the intent of Detective Polichetti when the black backpack was raised into the air. Huang could have stepped forward to claim the backpack but

---

[2] SA Flint testified that Detective Polichetti held up the backpack and "asked if it belonged to anybody or who the backpack belonged to." (June 5th Tr. 78) In fact, SA Flint testified that Detective Polichetti "asked several times." (June 5th Tr. 78-79).

instead did nothing.  As a result, Huang abandoned the backpack, functionally denying his ownership of it, and therefore had no legitimate expectation of privacy in the backpack and the seizure of its contents did not violate Huang's privacy interests.

**II.  Adoyi Waived his Miranda Rights and His Statement is Valid and Should Not be Suppressed**

On the date of his arrest, Bouhari Adoyi was given Miranda warnings several times.  He was given Miranda warnings by SA Cantwil when he was initially arrested. (May 21st Tr. 31).  He was given Miranda warnings by SA Bratz before he provided an oral statement. (June 15th Tr. 13-15). Finally, Adoyi was read Miranda warnings again by SA Bratz before SA Bratz took Adoyi's written statement. (June 5th Tr. 18).  Each time he was given Miranda warnings, Adoyi voluntarily waived his Miranda rights, either orally or in writing.  As a result, his statement should not be suppressed.

To establish that a defendant validly waived his Miranda rights, the government must provide by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving the right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995).  Express written or oral consent of waiver of the right to remain silent or of the right to counsel is not required and waiver can be inferred from silence, coupled with the understanding of [the defendant's] rights and a course of conduct indicating waiver." North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Tutino, 883 F.2d 1125, 1137-38 (defendant nodded his head "yes" when asked if he understood his rights).  In determining whether a confession is the product of coercion, courts must consider "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991); United States v. Bye, 919 F.2d 6, 8-9 (2d Cir. 1990) (test is whether waiver was "product of an essentially free and unconstrained choice," and reviewing court must consider totality of the surrounding circumstances); see also Colorado v. Connally, 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" within the meaning of the Due Process Clause) (emphasis added).

Here, Adoyi validly waived his Miranda rights and provided law enforcement with an uncoerced and voluntary

statement.  As stated previously, Adoyi could speak and understand English.  After Adoyi was arrested, SA Cantwil read Adoyi his Miranda rights in a calm tone of voice. (May 21st Tr. 31-34).  SA Cantwil did not have her gun drawn. (May 21st Tr. 31). At the time Adoyi was seated in a chair inside A&B Trading, with one hand handcuffed to the chair. (May 21st Tr. 31). SA Cantwil went line by line using a Miranda form and asked Adoyi if he understood each line. (May 21st Tr. 32). Adoyi acknowledged that he understood each line of the Miranda warnings. (May 21st Tr. 33).  Adoyi did not indicate to SA Cantwil that he did not understand English or needed an interpreter. (May 21st Tr. 34). SA Cantwil then went line by line through the waiver of Miranda rights, Adoyi acknowledged he understood each line, and waived his rights. (May 21st Tr. 33). Indeed, although he agreed to waive his rights, Adoyi felt sufficiently free to refuse to sign the waiver form.  Throughout the course of his detention at A&B Trading when SA Bratz was sitting with him, Adoyi felt comfortable enough to ask SA Bratz questions, make conversation, and make requests to eat, drink, and use the bathroom – all of which agents allowed him to do.  At no time did SA Bratz threaten Adoyi or speak to him in an angry or hostile tone of voice.

The circumstances surrounding both Adoyi's waiver of his Miranda rights and his subsequent statement to SA Bratz were not coercive.  After a period of time at A&B Trading, Adoyi was subsequently transported to an interview room at the New York field office of the Secret Service where he gave a statement to SA Bratz. (June 5th Tr. 11)  The interview room itself was a standard conference room with a table and chairs. (June 5th Tr. 12). Because the interview room is within an area in the Secret Service office where prisoners are processed and interviewed, Secret Service safety policies require that agents secure their firearms in a locked area. (June 5th Tr. 12).  SA Bratz and his partner followed this procedure. (June 5th Tr. 12).  Thus, SA Bratz did not place his firearm on the table, as Adoyi claimed. (June 20th Tr. 39, 46).  Indeed, Adoyi's testimony on this point was blatantly false.[3]

Adoyi was at first handcuffed to the chair and eventually the handcuffs were removed entirely. (June 5th Tr. 13). Prior to providing a statement, SA Bratz again reviewed Adoyi's Miranda rights using a Secret Service form. (June 5th Tr. 18).  SA

---

[3]  Adoyi's testimony that a firearm was left unsecured on the table in the interview room is even more incredible considering that SA Bratz testified that Adoyi's handcuffs were removed during the interview. (June 5th Tr. 13).

-16-

Bratz went line by line and after each line asked Adoyi if he understood. (June 5th Tr. 13). After each line, Adoyi stated that he understood. (June 5th Tr. 15). Adoyi did not request an interpreter or indicate that he didn't understand what SA Bratz was saying. (June 5th Tr. 16-17). Adoyi signed the Miranda warnings and waiver, indicating that he understood his rights and waived his rights. (June 5th Tr. 17).

Adoyi then provided a statement to SA Bratz. Importantly, SA Bratz had very little knowledge of the case involving Adoyi and A&B Trading prior to Adoyi's statement. (June 5th Tr. 12). All of the information in the written statement derived from Adoyi himself. Adoyi also made corrections to SA Bratz's transcription of Adoyi's words, possessing both sufficient knowledge of English and enough comfort with SA Bratz to make corrections to the written statement. (June 5th Tr. 20) Adoyi signed the statement in multiple places, including initialing corrections that he made. (June 5th Tr. 18-25).

All of these circumstances support a finding that Adoyi's waiver of his Miranda rights and his subsequent statement were knowing and voluntary. Over the course of July 26, 2006, Adoyi was read his Miranda rights *three* times. Each time, he waived his rights. When read his rights by SA Bratz, Adoyi *signed* a Miranda warning and waiver form. Adoyi never indicated to anyone that he did not understand English or that he needed a interpreter. Additionally, Adoyi, as previously stated, understood and could speak English. Adoyi's contention that he did not understand either what he was doing or what was being said to him is incredible, particularly considering his understanding of English (including conversations with agents), his signing of a Miranda waiver (after having refused to sign such a waiver previously), and his signed statement. Finally, the aforementioned circumstances of Adoyi's arrest and detention support a finding that agents treated Adoyi respectfully, without hostility or pressure to make a statement.

### III. The Length of Time Between Adoyi's Arrest and his Presentment Did Not Prejudice Adoyi and Does Not Justify Suppression of His Statement.

Adoyi argues that his statement should be suppressed because there was an unjustified delay between his arrest and arraignment. However, this argument fails. Under Fed. R. Crim. P. 5(a)(1), defendants arrested must be arraigned "without unnecessary delay" before a magistrate judge or other judicial officer. What constitutes "unnecessary delay" requires a factual inquiry, but the statute creates a "safe harbor," where a

voluntary post-arrest confession will not be suppressed solely on the basis of pre-arraignment delay if the confession is made within six hours of arrest.  See 18 U.S.C. § 3501.

However, even if the delay in bringing a defendant before a magistrate judge is in excess of the statutory limit of 6 hours and such delay is unnecessary, the statute does not require a finding that the confession obtained was involuntary. United States v. Perez, 733 F.2d 1026, 1035 (2d Cir. 1984). Discretion is vested in a district court judge to exclude or not to exclude a confession upon his finding that a delay of more than six hours was not reasonable.  See id.  Even a delay of more than two days did not result in suppression because it involved a weekend, and there was "no lengthy, hostile, or coercive interrogation."  United States v. Rubio, 709 F.2d 146, 153 (2d Cir. 1983).  There are a number of cases from various circuits in which extended delays between arrest and arraignment did not result in confessions being suppressed.  See United States v. Burgos, 579 F.2d 747, 749-50 (2d Cir. 1978)(finding that fifteen hour delay between arrest and arraignment did not require exclusion of his voluntary confession); United States v. Perez-Bustamonte, 963 F.2d 48, 53 (5th Cir. 1992)(finding 60 hour time period between arrest and confession did not render confession inadmissible); United States v. Bustamonte-Saenz, 894 F.2d 114, 119-20 (5th Cir. 1990)(upholding the admission of a statement made 9 hours after the arrest); United States v. Manuel, 706 F.2d 908 (9th Cir. 1983)(delay over six hours merely a voluntariness factors).

In this case, Adoyi was arrested sometime between 12:30 and 1 p.m. on July 26, 2006.  Adoyi's written statement was taken at around 10:11 p.m.  Adoyi was presented the next morning before a United States Magistrate Judge.  Adoyi's confession was only a few hours outside the six hour "safe harbor" of 18 U.S.C. § 3501.

In Rubio, 709 F.2d at 152, the Second Circuit held that a lapse of hours between arrest and arraignment, standing alone, does not require the exclusion of a statement made during the period.  The Circuit found that "[it is not the lapse of time but the use of the time, when the commissioner or magistrate is unavailable, to employ the condemned psychologically coercive or third degree practices [of interrogators] which is proscribed." Id. (quoting United States v. Maurer, 450 F.2d 373, 376 (2d Cir. 1971)).  The Circuit further held that the length of pre-arraignment delay is just one of the factors to employ in evaluating the voluntariness of a confession.  In that case, there was no evidence that the defendant was subjected to protracted interrogation or threatened or cajoled into making a

statement to the government's attorney.  As a result, the Circuit held that despite the fact that the defendant was arraigned after a full post-arrest weekend, statements made by the defendant were properly not suppressed.

Similarly, in this case there were no indications of coercive custodial interrogation or protracted interrogation. While Adoyi was sitting in A&B Trading, agents did not try to elicit a statement from Adoyi.  In fact, Adoyi was generally cooperative, waiving his Miranda rights, consenting to a search of A&B Trading, and providing information concerning a storage room.  When Adoyi was transported to the New York field office of the Secret Service, Adoyi was provided his Miranda warnings again which he again waived, and voluntarily made a statement to SA Bratz.  Any delay in taking a statement or in arraigning the defendant was not due to any effort to coerce or pressure Adoyi to make a statement.  Adoyi was lodged overnight, *without further questioning*, so he could be presented in the morning, due to the availability of Magistrate's court.  Under these factual circumstances, Adoyi's argument concerning speedy presentment fails and Adoyi's statement should not be suppressed.

**IV.   The Search Warrant of the Second Floor of the "India Building" was Valid and Should Not be Suppressed**

For the first time in his post-hearing briefs, Adoyi seeks to suppress items seized pursuant to a search warrant. Adoyi cites no law and references the search warrant for the Second Floor room at the India Building, located at 146 East 29th Street in Manhattan, New York, signed by United States Magistrate Judge Debra Freeman on July 26, 2006.  Adoyi speculates that the probable cause for the search warrant derived from an unlawful search of that room and as a result, the items seized pursuant to the search warrant should be suppressed.  Adoyi's argument, based on rank speculation, fails.

Great deference is accorded a probable cause determination made by a judicial officer issuing a warrant. See United States v. Nicholls, 912 F.2d 598, 602 (2d Cir. 1990). Here, probable cause was based upon information learned throughout the course of the Secret Service investigation of A&B Trading and statements by Adoyi to law enforcement which were reported "in substance and in part." Adoyi Post-Hearing Brief, Exhibit A at ¶2.

In the affidavit supporting the search warrant, probable cause to search the second floor room at the "India Building" was based on (1) surveillance of Adoyi entering and

-19-

exiting the India Building with counterfeit handbags, (2) statements made by Adoyi on the date of his arrest, and (3) information from the owner of the India building.[4]  This is clear on the face of the search warrant affidavit as signed by Magistrate Judge Freeman.  The probable cause justifying the search warrant was not based in any way on an illegal search of that Second Floor room as Adoyi speculates, and as a result, defendant's motion to suppress the items seized pursuant to this search warrant must be denied.

## CONCLUSION

For the foregoing reasons, the defendants' motions to suppress should be denied in their entirety.

> Respectfully Submitted,
>
> MICHAEL J. GARCIA
> United States Attorney
>
> By:   /s/ Steve C. Lee
> Steve C. Lee
> Assistant United States Attorney
> Telephone: (212) 637-2314

cc:  Kate Martin, Esq.
     Attorney for Angela Huang

     Christopher Flood, Esq.
     Attorney for Bouhari Adoyi

     Joel Stein, Esq.
     Attorney for Fuyin Huang

---

[4] When SA Bratz told Adoyi that he had been seen walking out of the India Building with counterfeit handbags, Adoyi stated that he knew where the room was and then Adoyi accompanied the agents to the India Building and pointed out the door to the room on the Second Floor. (June 5th Tr. 9-10). Eventually, that same day, the owner of the India Building confirmed that A&B Trading leased that particular second floor room. (Adoyi Post-Hearing Brief, Exhibit A)